Shall I begin? Yes, please. Good morning. I'm Daniel Kaplan. I represent the appellant Jose Cortez-Luna. Counsel Tara Hovland for the co-defendant, Enrique Cerrato Navarro, is here. We've consulted and decided that I will handle the argument, but we will consult during the preparation for rebuttal. All right. On the Sunday after Christmas in the year 2015, the two defendants in these appeals drove through a suspicious place, a place well-known as a way to get around a Border Patrol checkpoint for smuggling contraband. It was a suspicious day. The fields were empty for anyone except some irrigators. It was a suspicious car, a Buick Regal, that didn't belong in an agricultural area and was not familiar to the agents who were posted constantly in that position. They drove in a suspicious fashion far below the speed limit with someone following them and made sudden turns. The checks that Agent Gatewood ran on the plate as he followed them showed that it had suspiciously crossed the border from Mexico within two hours of that time. And when the car came to a stop in an open area, the two individuals in the car suspiciously got out and walked away from the field near which they were parked. Can I ask, who are you representing? Yes. I thought I might get a question like that. This is my point. There was challenges below to the reasonable suspicion. I am accepting and, in fact, embracing the reasonable suspicion because in the appeal, this is my point. The district court found, and I do not dispute, that there was piles of reasonable suspicion at 10.30 a.m. when that car came to a stop and Agent Gatewood pulled up behind it. Now, I've scoured this record over and over to try to figure out why Agent Gatewood, who knew well enough that 15 minutes away there was a drug-sniffing dog that could be brought to the scene, waited so long with all that suspicion to call that drug-sniffing dog, which he himself said he knew was a quick way to resolve suspicions and get people on their way if suspicions are unfounded. But the record also shows that the drug jug was used at a very busy checkpoint, and they do not call that dog out unless they're really sure it's necessary. That is, if these people went ahead and confessed, why would you call the dog suspicious? They did step-by-step interrogation, which they're trained to do. That was their argument. What's wrong with that argument? The argument is it's rational, but it's not supported by the record, and the burden is on them. So the argument was made in Mr. Boyd's brief. Well, it wasn't exactly made. It was sort of hinted at, that, well, maybe they thought they didn't have to call the dog away from a busy checkpoint. And the sentence was written in such a way as to suggest that if they called the dog away from that IA checkpoint, that IA checkpoint would be dogless for that period of time. There's nothing to support that in the record. So why does that make the detention unreasonable, the length of the detention unreasonable? Well, in cases like Florida v. Royer and Place and this Court's decision in U.S. v. Currency, the point is made that when it's clear that there is a drug-sniffing dog that can quickly resolve suspicions. And in Royer, the Supreme Court said that was a detention that lasted all of 15 minutes in Royer. And the Supreme Court, among other things, said there were drug-sniffing dogs at this airport. They could have resolved their suspicions about that luggage perhaps without any detention. But in that case, they knew the person was coming to that airport at that time. They knew the plane was landing. There was no earlier warning that there's some suspicious people coming through, so bring that dog over here so we can take care of it. The case is not in point, is it? It is absolutely. Well, it's on point. I accept that distinction. But what I'm not saying they should have called the dog before the car even arrived. I'm saying at 1030 when that car came to us. But they didn't know the car was coming, so there's no way they could have called the dog. Of course, of course. I'm saying at 1030 when all of these things that I just enumerated were known and the district court found all of those specific things before 1030 were known at the time the car came to a stop, there was reasonable suspicion. At that point, if he had called the dog at 1030, the dog would have been there at 1045. Everything would have been over by 11. I'm not sure of that because we don't know what the dog was doing at that time. We only know when the dog got there. There's nothing in the record that said the dog was sitting there waiting for transport  to get there. Well, Zerega said it took me 15, 20 minutes to get there. There's nothing in the record. We know that. We know that. If the dog were ready and was not out sniffing some other cars, we know that. But we don't know that it would have happened. Things that we don't know do not go against us. They go against the government because the burden is on the government. Were you about to ask a question, Your Honor? I just, I guess I'm skeptical of the legal premise for your argument. It sounds like you're saying that the officers are not permitted to use any other techniques to dispel their suspicions other than bringing in the dog, and I don't know of any case that says that. That's not my position, Your Honor. My position is, as the Supreme Court said in Royer and this Court said in the Currency case, if there is a clear way of minimizing the seizure, and it is so clear and so clear, if you use that method, then the seizure is unconstitutional. And, again, in Royer it's 15 minutes, and this is not a least burdensome seizure analysis. The Supreme Court did not accept that, but they said it's unreasonable. But why isn't it reasonable to first engage the potential suspects in questioning to see if maybe there are answers to dispel your suspicion before taking a dog away from other important activities at the border checkpoint or at the checkpoint or whatever it is? Again, I do not accept the idea that there's no evidence that the dog being brought away from the checkpoint would somehow injure the or would limit the checkpoint. There's no evidence that there were not other dogs there or that they needed the dog to stay there. Roberts. Okay. Fine. Well, whatever the dog. Maybe the dog was taking a nap and it needed to rest that morning. I don't really think it matters what the dog was doing. I'm just saying they're out in the middle of nowhere, right? Right. You can see that that's part of why it's suspicious. Why not first, before bringing in other resources, just see if we can resolve this right here? Hey, can I ask you a few questions? I don't see why that. First off, immediately when they turn around and approach him, he figures out they don't speak English. He knows, as he said many times, I spoke very limited Spanish. He's not going to reasonably allay his suspicions or confirm or deny anything. Speaking a language he doesn't he barely understands and barely can speak. Another thing is, even if his Spanish was good, the questioning is not likely to resolve suspicions the way bringing a drug-sniffing dog in. All it's going to do is maybe add on a little more suspicion and a little more suspicion while drawing things out unnecessarily. Why do you say you get the result? Because we know what would happen here. But suppose this person was legally there and they could just show their documents and check the documents and everything is fine. You radio us in and they leave. We don't know what would happen if these people were honestly what they claimed they were. Well, they were legally there. That's exactly what happened. None of that went to whether there were drugs in the car. That only showed they were legally present with green cards. I would like to try to save the balance of my time for rebuttal. All right, counsel. Thank you. We hear from the government. May it please the Court. Good morning, Your Honors. My name is William Voigt. I'm an AUSA from Phoenix here for the United States. There is more than one way to reasonably investigate a crime. My colleague cites the $191,000 currency case. In that case, this Court explicitly said agents are not required to choose what hindsight says may be the fastest way of investigating something. What they're required to do is pick any one of the reasons. What's the name of that case? The $191,910 case. Yes. Which I will also try to call the currency case just because it's unrealistic. I read it. But what the Fourth Amendment requires is you pick any one of the reasonable options available to you. The district court properly found that's exactly what the agents did here. They had, as has been conceded, enormous suspicions. And what they did was pick one reasonable way to investigate. Start by talking to people. It can't be unreasonable to start by talking to the suspects that they have on the  Well, but opposing counsel makes the point that because of the limited Spanish language ability of the agent, that was really not helpful. So what's your response to that? I think I have two responses to that, Your Honor. The first is that he's talking about Agent Gatewood, who was the first agent on scene who interacted from 1030 to 1040. That is time he himself concedes they were not detained. Defendant Cortez's own argument is that detention didn't begin until 1040 when these IDs were turned over. So that's not even part of the detention. What happened at 1040 is that the next closest Border Patrol agent, who had much better Spanish, Agent White, and the district court found, and this factual conclusion I think is unimpeachable, that Agent White had sufficient Spanish language ability to have this sort of conversation. He investigated by talking to them. And what did it reveal? That they were telling them stories that didn't make sense. Whose car is this? They gave different accounts. Ultimately, they settled on it's a friend I don't know, and then they couldn't name the friend. There's nobody else in the fields. You know, do you have any tools? I don't have any tools. Where are your tools? I don't know. You don't have any food. Usually people have food if they're out here to work in these deserted fields. Do you have food? No. Why? I don't know. These are answers that continue to grant mounting and mounting suspicion, and those happen with Border Patrol Agent White, who the district court found had sufficient Spanish proficiency to have that conversation. The next agent they called was Agent Rivera, and that's the agent to whom Defendant Cortez gave consent to search the car. He is a fluent native Spanish speaker. He grew up in Puerto Rico. There has never been any question about his Spanish language abilities. And so the factual statement that they make is, I think, unsupportable, because the agents who were having these conversations during what is argued to be the detention certainly had the Spanish skills to do so. I do want to respond to the question about what the record shows about what the dog was doing. It is true nobody asked the question specifically are there other dogs. I thought you were going to say nobody asked the dog. He's a lovely dog, I'm sure. But what was asked of Agent Gatewood is he said he didn't get in touch until the checkpoint where the dog was some 20 minutes away until about 11 o'clock. But he said he had been trying, and they were out in the lanes. If I may just read a couple of sentences. This is from ER 56. We called a couple of times on the radio. We called the checkpoint on the radio. But if they're out working in the lanes, they don't hear the radio all the time. So it took us a few attempts to get a hold of them. So the challenge the defendant is making here is essentially to this sliver of the detention, not the 20 minutes it took the dog to get out there. It certainly can't be this very beginning part that the defendant isn't even detained. It's this 10 or 20 minutes where the agents are, with sufficient Spanish language proficiency to do this, attempting to understand the defendant's stories. And that is a very reasonable way to investigate. Especially when you have two defendants there, you can see not only are their stories consistent with the facts, but are they consistent with each other? A drug dog, although a powerful investigative tool, can't do that. One thing that you can do that a dog can't do is investigate someone's demeanor. Do these people seem nervous? In fact, both Agent White and Agent Gatewood testified there were ample indicia of nervousness. So those are things that drug dogs can't do, that investigating by questioning can do. And for those reasons, this was a very reasonable detention. Roberts. How come the agents who are on this particular patrol, why don't they just have a dog in the car? It seems like that's mostly out there what they're trying to do, right, is interdict drugs. So drug trafficking. So I don't understand why they're leaving the dog at the checkpoint in the first place. It doesn't make much sense. Well, the dog's role at the checkpoint is sort of the reason that we have this Dome Valley situation in the first place. There's only two ways out of Yuma, if you want to snuggle around. No, I get why the dog is at the checkpoint. I'm saying why not get another dog? Let's get dog number two and have it ride in the car, because that's what they're out there trying to catch, mostly. Maybe some smuggling of undocumented immigrants. I grant that. But isn't most of it drug interdiction? It's actually the testimony in this case is they were suspicious both of alien and drug smuggling. It sort of happens the same way, unfamiliar cars traveling through this particular high-volume area. I think in a perfect world, that would be true. Under the realities of law enforcement resources, you can't have a dog in every car. There were actually three separate cars there. You had Agent Rivera at the entrance to observe unfamiliar cars, and then Agent Gatewood and Agent White towards the exit end. So I think that would be great, just like I think it would be great if our law enforcement officers had lots of advantages they don't have. But it certainly is not unreasonable for the defense to, instead of immediately calling for a dog and taking it away from whatever it's doing, because they are clearly finite resources, to spend some time talking. I was curious about when the actual seizure took place. At the point where Agent Gatewood was first asking him questions, they turned over their green cards. I want to go back before that. What question did he ask? What does the record show? Did he ask, give me your green cards, or did he say, show me some identification? So what the record shows is that at 10.30 a.m., when the defendants voluntarily stopped their car in this clearing, Agent Gatewood pulled up some distance away, and he got out of his car. The defendants were walking towards the Gila River. Well, we call it a river in Arizona. It's a dry stream bed. And he called out and said, how are you doing? Can I help you find anything? At that point, the defendants turned around and started walking back to him and started talking to him in Spanish. What he does at that point is try to find out ---- My question is very specific. When they did turn, hand over their green cards, what question caused them to hand them over? What was he asked them to do? He said, I asked them for their ---- I'm trying to ---- I won't have verbatim, but he said, I asked them if they had any identification so I could do background and immigration checks. So he didn't ask them for green cards. He asked them for identification. Correct. And they handed over their green cards. Correct. At that point, Agent Gatewood had no idea whether they were, you know, citizens or not. I understand. I just want to know what the record showed. Yes, Your Honor. It was a question that was explicitly framed as an ask, not a demand. And he, you know, he didn't have a basis to demand anything. So for all of those reasons, I won't address the reasonable suspicion since it seems to have been effectively conceded today. We do think that this was not a de facto arrest. It was reasonable and well within the amount of time that was provided for by law to investigate the enormous suspicions and mounting suspicions that were developed by the defendant's own insufficient responses and questionable responses to the law enforcement inquiry. Unless the Court has any further questions, I would submit. It appears not. Thank you, counsel. Thank you. Rebuttal. Thank you, Your Honor. The fact that 1030 to 1040 is not part of the seizure does not change the fact that it's part of the delay, the unnecessary delay. The dog had been called at 1030, could have been there at 1045, whole thing done by 11 o'clock. So, counsel, how many minutes precisely are you saying the detention lasted? The unnecessary part, I would say half an hour because if he called at 1030, dog got there, so it would have been over at 11 instead of 1145. So you're saying 30 minutes. Sorry. 1030 to 1045, the dog would have been there at 11 and the drugs would have been found at 1115, so it's instead of 1145, 30 minutes unnecessary seizure. So your argument boils down to 30 minutes in your view of unnecessarily delay as a matter of fact. And that's why I ask you the question as to whether or not you're making the argument     that as a matter of law, a 30-minute delay is unreasonable. Well, in the Place case, I think it was, the Supreme Court was presented with the American Law Institute's proposed rule that 20 minutes should be sort of a set unreasonable point. And the Supreme Court said, we reject any idea that there should be any set rules like that. Every case is on its own facts. Right. So I do not propose that there's any rule of law or principle of law that will generally apply. This case, on its particular facts, shows that there were 30 minutes, a half an hour of unnecessary detention, which has still not been explained. Now, the government has asserted that Agent White spoke much better Spanish. I suggest the record does not support that. Agent White himself said his Spanish was very limited, that he didn't use, he couldn't use the right word for tools. The interpreter said it only kind of sounded like that. The men clearly were not. All of that was tested. Didn't he testify and his Spanish language skills were put to the test, so to speak, and so everybody knew how well he could speak Spanish. Well, the clearest indication of his Spanish is that he himself, together with Agent Gatewood, they both said, we don't know, we don't know if we've developed any suspicion here, because we both know our Spanish is weak. We need to bring in Rivera, who's a real Spanish speaker. And he confirmed that there were inconsistencies? Well, he also uncovered inconsistencies, but interestingly, they didn't come out the same way as Agent White said. Agent White said he asked him who owns the car, and he said it was his car. But when Agent Rivera asked him, presumably correctly, he said the car is possessed by somebody else, by a friend. So there is indication that Agent Rivera's correct Spanish elicited different responses, and Agent White's self-acknowledged flawed Spanish. So essentially, this is a case where it was simply unreasonable not to quickly bring in the dog sniff as in place, as in Royer, as in the currency case, when it was clearly a way, as Gatewood himself acknowledged, of quickly resolving the suspicions. Are there no further questions? Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Wallace, Rawlinson, Watford